IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL EMALFARB,<br><br>    Plaintiff,<br><br>v.<br><br>SEMINOLE HARD ROCK DIGITAL, LLC D/B/A HARD ROCK BET,<br><br>    Defendant. | Case No.: |

**COMPLAINT**

Plaintiff Michael Emalfarb ("Mr. Emalfarb" or "Plaintiff") brings this action against Seminole Hard Rock Digital, LLC d/b/a Hard Rock Bet ("Defendant"). In support of this Complaint, Mr. Emalfarb alleges as follows:

**PRELIMINARY STATEMENT**

1. This action arises from the deceptive conduct of Defendant, which was intended to, and did in fact, trick Mr. Emalfarb into relying on its false promises.

2. Defendant, acting through its employee Trent Cornacchione ("Mr. Cornacchione"), induced Mr. Emalfarb to enter into an agreement to waive his rights in a previous dispute between Mr. Emalfarb and Defendant and deposit and lose additional hundreds of thousands of dollars by making a false promise of lucrative future bonuses (the "Agreement").

3. More specifically, Defendant falsely promised Mr. Emalfarb an ongoing bonus of 20% of all funds he deposited ("Bonus Bet Agreement").

4. Based on Defendant's promise of a Bonus Bet Agreement, Mr. Emalfarb entered into the Agreement with Defendant.

5. Mr. Emalfarb would not have entered into the Agreement with Defendant if not for the false promise of the Bonus Bet Agreement.

6. Defendant knew Mr. Emalfarb would not enter into the Agreement without the promise of the Bonus Bet Agreement.

7. Mr. Cornacchione was at all relevant times a full-time employee and an agent of Defendant, employed as a VIP Account Manager.

8. At all relevant times Mr. Cornacchione held himself out to be a full-time employee and agent of Defendant, with full authority to negotiate on behalf of and bind Defendant.

9. At all relevant times, Defendant was aware that Mr. Cornacchione was acting as its agent, negotiating on its behalf, and acting with authority to bind the company.

10. Mr. Emalfarb reasonably believed that Mr. Cornacchione was an agent of the Defendant with full authority to negotiate on its behalf and bind the company.

11. As VIP Account Manager for the Defendant, it was among Mr. Cornacchione's job duties to offer, negotiate, and finalize financial agreements with high-value customers such as Mr. Emalfarb.

12. Defendant confirmed and repeatedly reaffirmed the 'Bonus Bet Agreement' to Mr. Emalfarb in writing through numerous text messages from Mr. Cornacchione.

13. Defendant knew and intended that the Bonus Bet Agreement not just induce Mr. Emalfarb to enter the agreement, but to continue depositing and losing money to Defendant.

14. Defendant intended that Mr. Emalfarb rely on its false promises, and that Mr. Emalfarb would incur substantial financial losses, all to the benefit of Defendant, thereby.

15. Mr. Emalfarb did, in fact, rely on Defendant's false promises and did, in fact, incur substantial financial losses thereby.

16. After deceiving the Mr. Emalfarb into entering the Agreement, Defendant attempted to add a condition which prohibited Mr. Emalfarb from freely withdrawing his own money from Defendant's platform (the "Condition").

17. The Condition was never even mentioned, and certainly never agreed to, prior to the Agreement.

18. Mr. Emalfarb would not have agreed to the Agreement if the Condition was included.

19. Defendant knew the Mr. Emalfarb would not have agreed to the Agreement if the Condition was included.

20. Defendant intentionally concealed the Condition from Mr. Emalfarb to deceive him into entering the Agreement, including deposits and losses of hundreds of thousands of dollars pursuant thereto.

## THE PARTIES

21. Plaintiff Michael Emalfarb is an individual who resides in Chicago, Cook County, Illinois, and is a citizen of the State of Illinois.

22. Defendant Seminole Hard Rock Digital, LLC is a Florida limited liability company that operates the "Hard Rock Bet" online sportsbook in Illinois. Hard Rock is a citizen of Florida for diversity purposes.

23. Seminole Hard Rock Digital, LLC d/b/a Hard Rock Bet is engaged in "trade and commerce" inside the state of Illinois as those terms are defined under the Illinois Consumer Fraud and Deceptive Business Practices Act.

24. The transactions described in this Complaint are "trade and commerce" as those terms are defined under the Illinois Consumer Fraud and Deceptive Business Practices Act

## JURISDICTION AND VENUE

25. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are diverse from each other and the amount in controversy exceeds $75,000.

26. Defendant is subject to the personal jurisdiction of this Court because each of them conducts substantial and continuous business and resides in this State and in this district.

27. Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred therein, and because Defendant resides and conducts business in the district.

## BACKGROUND

A. **Hard Rock's VIP "Point of Contact"**

28. Mr. Emalfarb was considered by Defendant to be a high-value consumer of the goods and services offered on the Defendant's sportsbook platform.

29. As a high-value consumer of its product and/or services, Defendant assigned Mr. Cornacchione to be Mr. Emalfarb's VIP Account Manager on or around October 30, 2024.

30. Among other things, it was Mr. Cornacchione's job as VIP Account Manager to maximize the amount Mr. Emalfarb deposited and lost on Defendant's sportsbook platform.

31. Mr. Cornacchione maximized the amount Mr. Emalfarb deposited and lost on Defendant's sportsbook platform by regularly offering, negotiating, and providing bonuses and other incentives to Mr. Emalfarb.

4

32. Mr. Cornacchione at all times relevant functioned as a representative and agent of Defendant, handling all matters and communication related to Mr. Emalfarb's wagering and VIP benefits with Defendant.

### B. Illinois Gaming Board Complaint

33. From December 2024 through January 2025, Mr. Emalfarb was provided with repeated instances of misinformation while using Defendant's sportsbook platform.

34. Mr. Emalfarb alleged and conveyed to Defendant that it had failed to adequately address these instances of misinformation despite Mr. Emalfarb's repeated complaints, and that it directly caused Mr. Emalfarb to lose hundreds of thousands of dollars, which should not have been lost.

35. More specifically, Defendant's platform repeatedly conveyed mislabeled information and incorrect data to consumers, including Mr. Emalfarb, resulting in substantial unfair "losses" to Mr. Emalfarb.

36. After repeated attempts to resolve these issues directly with Defendant, Mr. Emalfarb filed a formal complaint with the Illinois Gaming Board ("IGB") on January 6, 2025 (the "IGB Complaint").

37. The IGB Complaint sought regulatory relief for the losses incurred as a result of the platform's provision of misinformation and alleged improper handling of bets.

38. The IGB Complaint, and among other things, sought relief for Mr. Emalfarb's hundreds of thousands of dollars in financial damages, all directly attributable to the misinformation and incorrect data provided to consumers, including Mr. Emalfarb, by the Defendant.

**C. Settlement Negotiations and the Bonus Bet Agreement**

39. Following the IGB Complaint, Defendant participated in settlement discussions with Mr. Emalfarb.

40. Mr. Cornacchione was at all times the lead in negotiating with Emalfarb on behalf of Defendant to find a cooperative resolution.

41. Mr. Emalfarb and Defendant engaged in multiple negotiations aimed at settling the IGB Complaint.

42. After several discussions and drafts, Defendant sent Mr. Emalfarb a proposed settlement agreement (the "Proposed Settlement Agreement"). A true and accurate copy of the Settlement Agreement is attached hereto as Exhibit A.

43. The Proposed Settlement Agreement, inter alia, contained the following terms:

   1. $120,000 credited to Mr. Emalfarb's account within five (5) business days;
   2. $30,000 in bonus bets, no expiration, credited within five (5) business days;
   3. 20% match for up to $100,000 in net new deposits, offer expires seven (7) days after signing;
   4. Release of claims clause (including the IGB Complaint).

44. Mr. Emalfarb conveyed to Defendant that he was declining the Proposed Settlement Agreement.

45. Defendant understood that Mr. Emalfarb was declining the Proposed Settlement Agreement.

46. Defendant responded by assuring Mr. Emalfarb that they still wanted to settle, and would be providing him with an improved settlement offer.

6

47. That improved settlement offer came in the form of the addition of the "Bonus Bet Agreement."

48. Under this arrangement, Mr. Emalfarb was promised an ongoing 20% deposit match, with the only condition being a 3x rollover requirement on all deposits up to $100,000, with the rollover to increase to 5x if Mr. Emalfarb was winning.

49. The Bonus Bet Agreement was confirmed by both Mr. Emalfarb and Defendant in numerous writings.

50. Defendant intended that Mr. Emalfarb rely on the Bonus Bet Agreement and the confirmations thereof before deciding to enter into the Settlement Agreement and deposit and lose additional hundreds of thousands of dollars on Defendant's platform.

51. Mr. Emalfarb did, in fact, rely on the Bonus Bet Agreement and the confirmations thereof before deciding to enter into the Settlement Agreement and deposit and lose additional hundreds of thousands of dollars on Defendant's platform.

52. Defendant offered the Bonus Bet Agreement to Mr. Emalfarb to induce Mr. Emalfarb to enter into the Settlement Agreement and deposit and lose additional hundreds of thousands of dollars on its platform, knowing it would not honor the terms of the Bonus Bet Agreement.

53. Defendant understood and intended that the Bonus Bet Agreement would serve as the primary inducement for Mr. Emalfarb to sign the Settlement Agreement, abandon his IGB Complaint, and continue playing on a platform that had already cost him hundreds of thousands of dollars due to Defendant's own transgressions.

54. Defendant assured Mr. Emalfarb on multiple occasions that the Bonus Bet Agreement would be honored, and knew that Mr. Emalfarb would not have entered into the Settlement Agreement but for the Bonus Bet Agreement.

55. On February 19, 2025, Mr. Emalfarb conveyed to Defendant:

> I am going to sign the agreement with the understanding of our conversations that we've laid out in the text messages with the limits being a [Bonus Bet Agreement] and that I will get 20% with a 3X rollover of deposits up to $100,000 that can go on and on and on but if I'm winning money then it will go to a 5X rollover which I am fine with.

56. On the same date, Defendant responded:

> Ok. Only thing I would change is the [Bonus Bet Agreement] is with the deposit match offers and reinvestment in your account. I do not control your limits (trading does)… but based on your previous action with us I do not foresee an issue with limit.

**D.     Post-Signing Conduct and Ongoing Inducement**

57. After Mr. Emalfarb executed the Settlement Agreement, Defendant immediately confirmed that the Bonus Bet Agreement was active and provided instructions for Mr. Emalfarb to participate.

58. To qualify for the Bonus Bet Agreement, Defendant explained to Mr. Emalfarb that he needed to play through the $120,000 credited under the Settlement Agreement. Consistent with the Bonus Bet Agreement, this threshold must be met to initiate the ongoing 20% deposit match for all deposits.

59. Relying on the Bonus Bet Agreement and Defendant's confirmations thereof over text message and telephone calls, Mr. Emalfarb made substantial deposits totaling over hundreds of thousands of dollars.

60. Despite Mr. Emalfarb's performance and reliance, the promised bonuses under the Bonus Bet Agreement were withheld by Defendant.

61. On March 3, 2025, Defendant instructed Mr. Emalfarb that it was withholding the promised bonus because "we need a new deal."

62. The new deal proposed by Defendants would prohibit Mr. Emalfarb from withdrawing his own money from the Defendant's platform at the end of the day ("Proposed Additional Term").

63. The Proposed Additional Term was only raised by Defendant after Mr. Emalfarb had agreed to the Settlement Agreement, Bonus Bet Agreement, and deposited hundreds of thousands of dollars more with the Defendant.

64. Mr. Emalfarb had historically and routinely withdrawn his money from the Defendant's platform at the end of the day since he began using the Defendant's platform back in October 2024, without any prior comment or restriction from Defendant.

65. There was no discussion of any kind about this term during negotiation of the Settlement Agreement and Bonus Bet Agreement.

66. Defendant conceded there had been no such discussion:

> if I had an intuition that you were going to withdraw your full balance daily and redeposit the next day then I would've mentioned that isn't acceptable and would not be approved by management. I don't have any other VIP out of the 500 I manage that does this. I apologize[,] I didn't specify this, but it wasn't something that was even on my mind.

67. Whether or not other VIPs withdrew their balance on a regular basis, there is no question that Mr. Emalfarb had been doing so, with Mr. Cornacchione as his host the entire time, since he first began depositing with Defendant back in 2024.

68. Defendant knew that it was Mr. Emalfarb's practice to withdraw his money from its platform on a daily basis long before the parties agreed to the Settlement Agreement and Bonus Bet Agreement.

69. Mr. Emalfarb would not have agreed to the Settlement Agreement and Bonus Bet Agreement, and would not have deposited hundreds of thousands of dollars, if the Bonus Bet Agreement had included the Proposed Additional Term.

70. Defendant knew Mr. Emalfarb would not have agreed to the Settlement Agreement and Bonus Bet Agreement, and would not have deposited hundreds of thousands of dollars, if it included the Proposed Additional Term.

71. Defendant intentionally omitted the Proposed Additional Term from Mr. Emalfarb to induce him to agree to the Settlement Agreement and Bonus Bet Agreement, and deposit and lose hundreds of thousands of dollars.

72. In the alternative, Defendant added the Proposed Additional Term as a pretext to sabotage the parties' agreements, which it never intended to honor, and withhold the bonuses promised to Mr. Emalfarb.

73. On or around March 12, 2025, Mr. Emalfarb contacted Defendant's compliance department in an attempt to enforce Defendant's promises under the Bonus Bet Agreement.

74. Compliance redirected the matter back to Mr. Cornacchione, who rebuked Mr. Emalfarb not to contact compliance again.

75. To the detriment of Mr. Emalfarb and the financial advantage of Defendant, Defendant did not honor its promises under the Bonus Bet Agreement, causing Mr. Emalfarb to deposit and wager hundreds of thousands of dollars and waive his rights regarding the previous issues set forth in the regulatory complaint in false reliance thereof.

E. **Damages**

76. Mr. Emalfarb incurred losses in reliance on Defendant's fraudulent inducements, including out-of-pocket losses, deprivation of promised bonus value, and lost opportunities resulting from Mr. Emalfarb's reasonable reliance on Defendant's misrepresentations.

77. Mr. Emalfarb's out-of-pocket losses are believed to be over $500,000.00. The precise amount is ascertainable and is kept and known by Defendant as a matter of law. Defendant has nevertheless refused to provide Mr. Emalfarb with the amount of his losses.

78. As a direct and proximate result of Defendant's conduct, Mr. Emalfarb suffered significant financial harm, including, but not limited to, losses associated with deposits, wagering activity, and the deprivation of promised bonus value.

79. As a direct and proximate result of Defendant's failure to honor the Bonus Bet Agreement and related inducements—promises made specifically to induce Mr. Emalfarb to resume play after prior platform issues and losses—Mr. Emalfarb suffered significant financial harm in an amount to be determined at trial.

## COUNT I
## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

80. Mr. Emalfarb realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

81. Defendant engaged in deceptive acts and practices by making repeated false promises to Mr. Emalfarb with the intent to induce Mr. Emalfarb to sign the Settlement Agreement, withdraw the IGB Complaint, and make additional deposits in the amount of hundreds of thousands of dollars.

82. Defendant engaged in deceptive acts and practices by intentionally omitting a material term from its promise until after Mr. Emalfarb had already signed the Settlement Agreement, withdrew the IGB Complaint, and made additional deposits to the Defendant's platform in the amount of hundreds of thousands of dollars.

83. Defendant's deceptive acts, practices, and omissions were material.

84. Defendant intended for Mr. Emalfarb to rely on its deceptive acts, practices, and omissions.

85. Defendant's deceptive acts, practices, and omissions were intended to mislead Mr. Emalfarb.

86. Defendant's deceptive acts, practices, and omissions did, in fact, mislead Mr. Emalfarb.

87. Defendant's deceptive acts, practices, and omissions were the direct and proximate cause of Mr. Emalfarb's financial damages, readily ascertainable and known to Defendant.

88. The Defendant's deceptive acts, practices, and omissions occurred during a course of conduct involving trade and commerce.

## COUNT II
### Fraudulent Misrepresentation

89. Mr. Emalfarb realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

90. Defendant made false statements of material fact to Mr. Emalfarb, including but not limited to the promise of an ongoing 20% deposit match bonus (Bonus Bet Agreement) as an inducement for Mr. Emalfarb to enter into the Settlement Agreement, withdraw his IGB Complaint, and deposit and wager additional funds on Defendant's platform.

91. Defendant knew these statements were false at the time they were made, or made them with reckless disregard for their truth or falsity, and never intended to honor the Bonus Bet Agreement.

92. Defendant intended for Mr. Emalfarb to rely on these false statements, and Mr. Emalfarb did, in fact, reasonably and justifiably rely on them by entering into the Settlement Agreement, withdrawing his IGB Complaint, depositing and wagering hundreds of thousands of dollars on Defendant's platform, and expecting significant bonus value.

93. As a direct and proximate result of Defendant's fraudulent misrepresentations, Mr. Emalfarb suffered significant financial harm, including but not limited to out-of-pocket losses, deprivation of promised bonus value, and lost opportunities.

94. Defendant's conduct was willful, wanton, and malicious, entitling Mr. Emalfarb to an award of punitive damages.

## COUNT III
## Unjust Enrichment

95. Mr. Emalfarb realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

96. Defendant, through its conduct described above, induced Mr. Emalfarb to deposit and wager substantial sums of money on Defendant's platform by making false promises and misrepresentations regarding ongoing bonus arrangements and account privileges.

97. As a result of Defendant's conduct, Defendant received and retained the benefit of Mr. Emalfarb's deposits, wagering activity, and the release of regulatory claims, while failing to honor the Bonus Bet Agreement.

98. Defendant's retention of these benefits is unjust, as it was obtained through deceptive, unfair, and inequitable means, including but not limited to misrepresentations,

concealment of material facts, and the imposition of undisclosed conditions after Mr. Emalfarb's performance.

99. Defendants should be compelled to disgorge and return to Mr. Emalfarb the value of the benefits unjustly retained, including but not limited to the value of Mr. Emalfarb's deposits, the lost bonus value, and any other amounts by which Defendant was unjustly enriched at Plaintiff's expense.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Emalfarb respectfully requests that this Court enter judgment against Defendant as follows:

1. An award of compensatory damages in an amount to be determined at trial, including, but not limited to, all actual out-of-pocket losses, lost bonus value, lost opportunity, and emotional distress as a result of Defendant's deceptive and unfair and fraudulent practices, and as a result of Mr. Emalfarb's detrimental reliance;

2. An award of restitution of all amounts by which Defendant was unjustly enriched at Mr. Emalfarb's expense;

3. An award of punitive damages in an amount sufficient to punish Defendant and to deter similar conduct in the future;

4. An order enforcing Defendant's promises under the doctrine of promissory estoppel, as appropriate.

5. An award of reasonable attorney's fees and costs incurred in bringing this action, pursuant to 815 ILCS 505/10a(c);

6. Such other and further relief as the Court deems just and proper.

Dated: October 6, 2025
      Chicago, Illinois

**NIXON PEABODY LLP**

By:   */s/ Christina E. Kurow*

Christina E. Kurow
70 W. Madison St., Suite 5200
Chicago, IL 60602
(312) 977-4400
ckurow@nixonpeabody.com

Paul Downs, Esq. (*pro hac vice forthcoming*)
55 W 46th St, Tower 46
New York, NY 10036
(212) 940-3000
pdowns@nixonpeabody.com

**LITT LAW, LLC**

Matthew R. Litt, Esq. (*pro hac vice forthcoming*)
789 Farnsworth Avenue
Bordentown, NJ 08505
(908) 902-7071
mlitt@littlaw.net

*Attorneys for Plaintiff*