UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Emalfarb, *Plaintiff*, v. Seminole Hard Rock Digital, LLC D/B/A Hard Rock Bet, *Defendant*. | No. 25 CV 12220 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Plaintiff Michael Emalfarb brings this suit against Defendant Seminole Hard Rock Digital, LLC, alleging that Hard Rock engaged in statutory and common law fraud by failing to fulfill its promise to provide him with an ongoing deposit match on its gambling platform in exchange for him signing a settlement agreement concerning a prior dispute between the parties. Before the court is Hard Rock's motion to dismiss, dkt. 22, which the court grants.[1]

I.  **Background**[2]

Seminole Hard Rock Digital, LLC operates "Hard Rock Bet," an online sportsbook in Illinois. [Dkt. 1, ¶ 22.] In January 2025, one of Hard Rock's VIP customers, Michael Emalfarb, filed a formal complaint with the Illinois Gaming Board alleging that defects and misinformation on Hard Rock's betting platform caused him to lose money on wagers. [*Id.*, ¶¶ 33–38.] In response, Trent Cornacchione, a Hard Rock employee assigned as Emalfarb's VIP account manager, took a lead in communicating and negotiating the details of a possible settlement agreement with Emalfarb. [*Id.*, ¶¶ 29, 39, 40.]

After several discussions and drafts, Hard Rock sent Emalfarb a proposed settlement agreement. [*Id.*, ¶ 42.] In exchange for Emalfarb releasing all claims against the company (including the formal complaint), Hard Rock offered to credit Emalfarb's account with $120,000 cash and $30,000 in bonus bets. [*Id.*, ¶ 43.] It also

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2] The following factual allegations are taken from Emalfarb's complaint, dkt. 1, and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. See *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

agreed to provide a 20% deposit match for up to $100,000 in net new deposits for seven calendar days. [*Id*.] Emalfarb declined the offer. [*Id*., ¶ 44.]

Hard Rock then assured Emalfarb that it still wanted to settle and would come back with an improved offer. [*Id*., ¶ 46.] On February 19, 2025, Emalfarb texted Cornacchione that he would "sign the agreement with the understanding of" the conversations laid out in their text messages "with the limits being a handshake deal and that" Emalfarb would "get 20% with a 3X rollover of deposits up to $100,000 that can go on and on and on" unless he is winning, in which case the deposit matches would switch to a 5X rollover.[3] [Dkt. 24-1 at 84.][4] Cornacchione responded:

> Ok. Only thing I would change is the handshake deal is with the deposit match offers and reinvestment in your account. I do not control your limits (trading does) and I don't want to give off that impression. Of course I will go to bat for you if needed but based on your previous action with us I do not foresee an issue with limits.

[*Id*. at 84.] The court will refer to this side agreement between Cornacchione and Emalfarb as the "Bonus Bet Agreement."

Two days after his text message conversation with Cornacchione, Emalfarb signed the proposed settlement agreement which, recall, agreed to credit Emalfarb's account with $120,000 cash and $30,000 in bonus bets and to provide him with a 20% deposit match for up to $100,000 in net new deposits (deposits exceeding the $120,000 payment pursuant to the agreement) for seven calendar days. [Dkt. 2 at 2.] Relevant here, the settlement agreement contained a disclaimer that "[a]ny future bonusing, including deposit matches, would be based on Customer play and is not guaranteed." [*Id*.] It also contained a merger clause, explaining that the agreement "constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are no other written or oral agreements understandings or arrangements except as set forth herein. The terms of this [agreement] may not be modified or waived except in writing signed by both HRD and Customer." [*Id*. at 3.]

---

[3]  Emalfarb does not define "rollover" in his complaint, and neither Emalfarb nor Cornacchione define it when negotiating the Bonus Bet Agreement. Hard Rock explained in its brief that generally "'rollover' means the amount 'that bettors must meet before they can withdraw any winnings earned from using a bonus … [T]he rollover [] will be a multiple of the deposit …" [Dkt. 23 at 11 (quoting Sam Russell, "Rollover in Betting: What is it and How it Works," BetSperts, (last accessed January 22, 2026, https://www.betsperts.com/news/sports-betting-guides/what-is-rollover-in-betting.)]

[4]  Hard Rock attached to its motion to dismiss almost 150 pages of text message communications between Emalfarb and Cornacchione in which the two discussed the Bonus Bet Agreement. [Dkt. 24-1.] The court considers the messages only to the extent they are referenced in and central to Emalfarb's complaint. See *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Emalfarb then sought further clarification about the Bonus Bet Agreement. Through a text dated February 22, 2025, Cornacchione explained that, before receiving deposit matches, Emalfarb needed to play through the $120,000 credited pursuant to the settlement agreement. [Dkt. 1, ¶ 58; Dkt. 24-1 at 93–95.] He also told Emalfarb that, while not "spelled out in the agreement," "it is assumed" that Emalfarb would not withdraw immediately after depositing in order to get his bonus. [Dkt. 24-1 at 100.]

Emalfarb alleges that, relying on the Bonus Bet Agreement, he "made substantial deposits totaling over hundreds of thousands of dollars." [Dkt. 1, ¶ 59.] On March 3, however, Cornacchione told Emalfarb that they needed a "new deal." [*Id.*, ¶ 61.] The new deal would prohibit Emalfarb from withdrawing his money from his Hard Rock account on a daily basis and instead limit him to weekly withdrawals. [*Id.*, ¶ 62.] When explaining the weekly withdrawal limit, Cornacchione apologized to Emalfarb for not specifying the limit when negotiating the Bonus Bet Agreement but explained that daily withdrawals weren't "something that [were] even on [his] mind" because no other VIP withdrew deposits so frequently. [*Id.*, ¶ 66.] According to Emalfarb, however, he routinely made daily withdrawals. [*Id.*, ¶ 64.]

Emalfarb contends that he never would have agreed to the settlement agreement or Bonus Bet Agreement if he had known about the withdrawal limit. Nor would he have deposited and wagered hundreds of thousands of dollars. [*Id.*, ¶¶ 69, 75.] According to Emalfarb, Hard Rock's failure to honor the Bonus Bet Agreement caused him over $500,000 in "out-of-pocket losses, deprivation of promised bonus value, and lost opportunities." [*Id.*, ¶¶ 76–77.] He filed this lawsuit alleging statutory fraud under the Illinois Consumer Fraud Act and common law fraud, as well as an unjust enrichment claim.

## II. Legal Standard

"To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in plaintiff's favor." *Id.* at 600 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The court assesses the complaint's plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

Claims concerning fraud, like those here, are subject to a heightened pleading standard under Rule 9(b). See *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); see also *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 2010 WL 624709, at *6 (N.D. Ill. Feb. 18, 2010) ("ICFA claims sounding fraud or deception are still required to meet the heightened pleading

3

standard of Rule 9(b)."). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity means the "'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). A defendant's "intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." Fed. R. Civ. P. 9(b); see also *Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015).

### III. Analysis

The Illinois Consumer Fraud Act "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices. It is to be liberally construed to effectuate its purpose." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). To state a claim for deceptive business practices under the ICFA, a plaintiff must allege "(1) that the defendant engaged in a deceptive or unfair practice; (2) with the intent that the plaintiff (or others) rely on the deception; (3) that the act occurred in the course of trade or commerce; and (4) that the deception caused actual damages." *Kahn v. Walmart, Inc.*, 107 F.4th 585, 598 (7th Cir. 2024).

An Illinois common law claim for fraudulent misrepresentation requires that a plaintiff plead facts showing "(1) a false statement of material fact (2) known or believed to be false by the person making it, (3) an intent to induce the plaintiff to act, (4) action by the plaintiff in justifiable reliance on the truth of the statement, and (5) damage to the plaintiff resulting from such reliance." *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1055–56 (Ill. 2020).

The parties agree, and Seventh Circuit case law makes clear, that neither Illinois common law fraud nor the ICFA permits a cause of action based on a mere breach of contract. See, *e.g.*, *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399–401 (7th Cir. 2011) (explaining that under Illinois law, fraud claims must be "more than restatements of the claimed breach of contract, albeit using the language of fraud"); *Albany Condo. Ass'n v. Republic Servs., Inc.*, 2025 WL 2644577, at *9 (N.D. Ill. Sept. 15, 2025) ("Under Illinois law, a fraud claim cannot rest on the same ground as a claim of breach of contract.") (cleaned up); see also *Johnson v. George J. Ball, Inc.*, 617 N.E.2d 1355, 1361 (Ill. App. Ct. 1993) ("Generally, a party may not recover in tort for what is essentially a breach of contract."). But after taking a close look at the complaint, the court cannot avoid the conclusion that, despite its label of fraud, a breach of contract claim—and nothing more—is precisely what Emalfarb alleges here.[5]

---

[5] Because the court concludes that the complaint fails to adequately allege a deceptive act, it does not address the alternative argument that the complaint fails to plead proximate causation of damages under the ICFA.

According to Emalfarb, in exchange for his signing the settlement agreement, Hard Rock, through Cornacchione, offered him a Bonus Bet Agreement. [Dkt. 1, ¶¶ 47, 53.] He accepted that offer and began performance by signing the settlement agreement and making deposits into his Hard Rock account. [*Id.*, ¶¶ 55, 59, 60.] Hard Rock then breached the Bonus Bet Agreement by "withholding the promised bonus." [*Id.*, ¶ 61.] And because of that breach, Emalfarb avers, he lost money gambling on Hard Rock's platform and signed a settlement agreement he would not have otherwise signed. [*Id.*, ¶ 75.] Straight to the point: Emalfarb's complaint describes a breach of contract. See *Vill. of Kirkland v. Kirkland Props. Holdings Co., LLC I*, 221 N.E.3d 300, 312 (Ill. 2023) ("To properly allege a breach of contract claim, a plaintiff must plead (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." (internal quotations omitted)).

Emalfarb tries to reframe the inquiry. He says that Cornacchione's promise to match certain deposits (the Bonus Bet Agreement) was a fraudulent misrepresentation that induced him to enter the settlement agreement and deposit more money into Hard Rock's platform. But this misses the point. The Bonus Bet Agreement itself was a contract, separate and apart from the settlement agreement.[6] Emalfarb's signing of the settlement agreement was a condition of that contract. So by alleging that he lost money based on Hard Rock's failure to abide by the terms of the Bonus Bet Agreement, he asks the court to conduct a breach of contract analysis— decide whether the contract was binding, define its terms, etc. See *GuideOne Mut. Ins. Co. v. Good Shepherd Lutheran Church*, 2021 WL 3077658, at *5 (N.D. Ill. July 21, 2021) (holding that fraud claim was duplicative of breach of contract claim because the alleged fraud was premised on the language of the contract). Indeed, it's the breach of contract that caused Emalfarb's alleged injuries, not any false statement made by Hard Rock.

This is not, in other words, a case where Hard Rock fraudulently induced Emalfarb to enter into a contract by making false representations about a present fact.

In *Five-Star AudioVisual, Inc. v. Unique Business Systems Corporation*, for example, a plaintiff brought claims based on fraud and breach of contract. 769 F. Supp. 3d 840, 852 (N.D. Ill. 2025). There, the defendant told the plaintiff that the software it was selling had certain capabilities. Relying on those statements, the plaintiff purchased the software. *Id.* As it turns out, the software did not operate as represented, forming the basis for the plaintiff's fraud claim. *Id.* The breach of contract claim, on the other hand, stemmed from a contract between the defendant

---

[6] To the extent that Emalfarb argues that the Bonus Bet Agreement was a modification of the settlement agreement (and not a separate contract), the point still stands: the court would have to conduct a breach of contract analysis, not a fraud analysis, to determine the merits of such a claim.

and plaintiff which provided that defendant would offer certain services pertaining to the software. *Id.* at 858. When the defendant failed to provide those services, plaintiff claimed breach of contract. *Id.*

In determining whether the plaintiff had brought a fraud claim "distinct from any underlying breach of contract," *Greenberger*, 631 F.3d at 399, the court observed that the fraud claim concerned what the defendant said it *could* do *before* the parties entered into the contract and the breach of contract claim concerned what the parties *would* do *after* they into the contract, *Five-Star AudioVisual, Inc.*, 769 F. Supp. 3d at 852. See also *Centre PC v. Auctus Grp.,* 2023 WL 5854398, at *3 (N.D. Ill. Sept. 10, 2023) (holding that plaintiff could bring fraud claim when defendant made misrepresentations about its insurance claim processing capabilities because, although the representations were made within a contract, they were fraudulent statements of present fact, not promises to perform future obligations); *Boyd Grp. (U.S.) Inc. v. D'Orazio*, 2015 WL 3463625, at *9 (N.D. Ill. May 29, 2015) (finding that *Greenberger* did not apply to a fraud claim "premised on alleged false statements that were made prior to the closing" of the agreement because they were a "fraudulent misrepresentation separate and apart" from the alleged breach of contract).

This case stands in contrast to *Five-Star AudioVisual*, though. Emalfarb does not allege that Cornacchione misrepresented what Hard Rock *could* do; he alleges that Cornacchione made a false representation about what Hard Rock *would* do.

In his response to Hard Rock's motion to dismiss, Emalfarb takes an unexpected position: he says that Hard Rock fraudulently misrepresented Cornacchione's authority. Specifically, he says that Cornacchione had authority to offer the Bonus Bet Agreement when he, in fact, did not. [Dkt. 27 at 10 ("Plaintiff alleges that Defendant's fraudulent representation of Cornacchione's authority was the proximate cause of him both waiving his rights to pursue the IGB Complaint and depositing additional hundreds of thousands of dollars, neither of which can be remedied under basic contract law.")]

The problem with this argument—and what makes it unexpected—is that Emalfarb did not include it in his complaint. Nowhere does Emalfarb plead that Cornacchione lacked authority to offer the Bonus Bet Agreement—indeed, his complaint suggests that Cornacchione did have authority. [Dkt. 1, ¶ 11 (explaining that "offer[ing], negotiat[ing], and finaliz[ing] financial agreements" were among Cornacchione's "job duties").] Emalfarb may not amend his pleading through his response brief. *Pirelli Armstrong Tire*, 631 F.3d at 441 (noting "the axiomatic rule that a plaintiff may not amend his complaint in his response brief").

Further, Emalfarb often does not differentiate between the acts of Hard Rock and Cornacchione in his complaint. [See, *e.g.*, dkt. 1, ¶¶ 46, 49, 53–56.][7] And perhaps most telling, when laying out his claims, Emalfarb avers that "Defendant engaged in deceptive acts and practices by making repeated false promises to Emalfarb," "intentionally omitting a material term from its promise," and making "false statements of material fact to Mr. Emalfarb, including but not limited to the promise of an ongoing 20% deposit match bonus (Bonus Bet Agreement)." [Dkt. 1, ¶¶ 81, 82, 90.] Put simply, the complaint makes no mention of Cornacchione's authority or lack thereof.

When all is said and done, then, Emalfarb alleges no misrepresentation beyond Hard Rock's promise to fulfill a future obligation. That is, his complaint contains only "breach-of-contract allegations dressed up in the language of fraud." *Greenberger*, 631 F.3d at 395. Such allegations "cannot support statutory or common-law fraud claims," so Emalfarb's claims for fraudulent misrepresentation and violation of the ICFA fail. *Id.* And because Emalfarb's "unjust enrichment claim rests on the same improper conduct alleged" in his fraud claims, that claim, too, fails. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

## IV. Conclusion

For these reasons, the motion to dismiss is granted. Plaintiffs are ordinarily given at least one opportunity to amend a complaint, see *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.,* 786 F.3d 510, 519–20 (7th Cir. 2015), so the claims are dismissed without prejudice.

Enter: 25-cv-12220
Date: January 28, 2026

_____
Lindsay C. Jenkins

---

[7] Emalfarb's failure to differentiate between the generic "Defendant" and "Cornacchione" also demonstrates his lack of particularity. See, *e.g.*, dkt. 1, ¶ ("Defendant assured Mr. Emalfarb on multiple occasions that the Bonus Bet Agreement would be honored…"); cf *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (dismissing plaintiff's fraud claim because complaint failed "to provide the specific names, dates, times, or content of the misrepresentations or omissions that give rise to the alleged fraud").

7