UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Michael Emalfarb,

    *Plaintiff*,

v.

Seminole Hard Rock Digital, LLC d/b/a
Hard Rock Bet,

    *Defendant*.

No. 25 CV 12220

Judge Lindsay C. Jenkins

## ORDER

Asserting that the gambling platform Seminole Hard Rock Digital made multiple misrepresentations while settling a prior dispute between the parties, Michael Emalfarb filed this lawsuit alleging unjust enrichment, common law fraud, and violations of the Illinois Consumer Fraud Act. [Dkt. 1.] The court dismissed his complaint, finding that his allegations raised, if anything, a potential breach of contract, not fraud. See *Emalfarb v. Seminole Hard Rock Digital, LLC*, 2026 WL 215781, at *5 (N.D. Ill. Jan. 28, 2026). In response, Emalfarb amended his complaint to add claims for breach of contract and negligent supervision. [Dkt. 35.] Before the court is Hard Rock's motion to dismiss the amended complaint. [Dkt. 38.][1] The court grants the motion.

## I.    Background[2]

Seminole Hard Rock Digital, LLC operates "Hard Rock Bet," an online sportsbook in Illinois. [Dkt. 35, ¶ 19.] In January 2025, Emalfarb, one of Hard Rock's VIP customers, filed a formal complaint with the Illinois Gaming Board alleging that defects and misinformation on Hard Rock's betting platform caused him to lose money on wagers. [*Id.*, ¶¶ 33–38.] According to Emalfarb, his formal complaint alleged damages worth $200,000. [*Id.*, ¶ 111.] In response, Trent Cornacchione, a Hard Rock employee assigned as Emalfarb's VIP account manager, took a lead in communicating and negotiating the details of a possible settlement agreement with Emalfarb. [*Id.*,

---

[1]    Citations to docket filings generally refer to the electronic pagination supplied by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]    The following factual allegations are taken from the amended complaint, *see* dkt. 35, and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. See *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

1

¶¶ 29, 39–41.] According to the complaint, Cornacchione presented himself as working with upper management on the negotiations. [*Id.*, ¶ 40.]

After several discussions and drafts, Hard Rock sent Emalfarb a proposed settlement agreement. [*Id.*, ¶ 44.] In exchange for Emalfarb releasing all claims against the company (including the formal complaint), Hard Rock offered to credit Emalfarb's account with a $120,000 credit and $30,000 in bonus bets. [*Id.*, ¶ 45.] It also agreed to provide a 20% deposit match for up to $100,000 in net new deposits for seven calendar days. Emalfarb declined. [*Id.*, ¶ 46.]

Cornacchione then assured Emalfarb that Hard Rock still wanted to settle and would come back with an improved offer. [*Id.*, ¶ 48.] Cornacchione then offered Emalfarb a "handshake deal" consisting of "an ongoing 20% deposit match, with the only condition being a 3x rollover requirement on all deposits up to $100,000, with the rollover to increase to 5x if [he] was winning." [*Id.*, ¶ 51.] According to the complaint, this so-called "Bonus Bet Agreement"[3] would be perpetual, meaning Emalfarb would receive the 20% deposit match "going forward indefinitely." [*Id.*, ¶ 52.] Hard Rock, for its part, knew that Cornacchione was negotiating the terms of the settlement agreement with Emalfarb on its behalf. [*Id.*, ¶¶ 54–55.]

On February 18, 2025 Cornacchione informed Emalfarb via text that he would "be receiving the final offer in writing shortly," which included what the two had discussed earlier on the phone: "120k cash, 30k bonus, 100k deposit match at 20% ($120k cash not included.)" [*Id.* ¶ 56.] In the same text, Cornacchione also said, "[f]uture deposit matches will be based on play but I'm fine with 20%." [*Id.*] The next day, Hard Rock's Vice President of Compliance emailed Emalfarb a settlement offer, stating that he had consulted with Hard Rock's "business team, including [Cornacchione.]" [*Id.*, ¶ 57.] And later that same day, Cornacchione texted Emalfarb:

> Yes I'm fine with 20% reinvestment going forward. If you're winning big with us that's great too. We may have to increase the rollover though so you're not just withdrawing and redepositing to get the 20%. That's why it's based on play. But yes, we're generally fine with 20% reinvestment and matches…[i]t won't be cut off. Itll be consistent matches as long as you meet the rollover requirements and you aren't abusing the offer

[*Id.*, ¶ 58.]

After he received that text, Emalfarb and Cornacchione spoke over the phone. [*Id.*, ¶ 59.] In that conversation, Cornacchione "guaranteed" that the Bonus Bet

---

[3]    In their conversations, Emalfarb and Cornacchione referred to the alleged arrangement as a "handshake deal," not "Bonus Bet Agreement."

2

Agreement was still being offered but explained that it "could not be in writing." [*Id.*, ¶ 60.] Following the phone conversation, Emalfarb texted Cornacchione:

> OK I am going to sign the agreement with the understanding of our conversations that we've laid out in the text messages with the limits being a handshake deal and that I will get 20% with a 3X rollover of deposits up to $100,000 that can go on and on and on but if I'm winning money then it will go to a 5X rollover Which I am fine with.

[*Id.*, ¶¶ 62, 72.] Cornacchione responded:

> Ok. Only thing I would change is the handshake agreement is with the deposit match offers and reinvestment in your account. I do not control your limits (trading does)… but based on your previous action with us I do not foresee an issue with limit.

[*Id.*, ¶ 73.] Emalfarb signed the Settlement Agreement the next day. [*Id.*, ¶ 74.]

Over the next few days, Cornacchione and Emalfarb continued to discuss the Bonus Bet Agreement. Cornacchione, for example, confirmed over text that he was "cool" with the deposit matches, as the two had "discussed before." [*Id.*, ¶ 75.] Cornacchione also encouraged Emalfarb to play through the $120,000 credit so he could begin receiving the 20% incentive. [*Id.*, ¶ 78.]

But on March 3, Cornacchione told Emalfarb that the Bonus Bet Agreement needed to change due to concerns from upper management. [*Id.*, ¶ 79.] Specifically, Cornacchione told Emalfarb that he could no longer withdraw his money from the platform on a daily basis. [*Id.*, ¶ 82.] Emalfarb did not agree to the new withdrawal limit, especially since the term had not been discussed prior to his signing the Settlement Agreement and he had a long practice of withdrawing his money each day. [*Id.*, ¶¶ 86, 89–90.]

Emalfarb then began questioning Cornacchione's authority to offer him the Bonus Bet Agreement in the first place. [*Id.*, ¶¶ 94–95.] But, according to the complaint, Cornacchione would not provide a clear answer. [*Id.*, ¶ 96.] And when Emalfarb attempted to raise the issue of Cornacchione's authority with Hard Rock's Compliance Department, Compliance reached out to Cornacchione, who then instructed Emalfarb not to contact Compliance again. [*Id.*, ¶ 99.]

In reliance on Cornacchione's statements about the Bonus Bet Agreement, Emalfarb deposited over $900,000 on Hard Rock's platform. [*Id.*, ¶ 101.] He did so because he believed that Cornacchione had authority to offer the Bonus Bet Agreement and that Hard Rock would abide by its terms. [*Id.*] Hard Rock, however, disavowed the Bonus Bet Agreement and did not provide consistent 20% deposit

matches. [*Id.*, ¶¶ 102, 104.] Between February 21 and March 24, 2025, Emalfarb lost $380,000 of his $900,000 deposits. [*Id.*, ¶ 107.] He also alleges that he suffered "deprivation of promised bonus value" and "lost opportunities." [*Id.*, ¶ 106.]

Seeking to recover his losses, Emalfarb filed this lawsuit. In his initial complaint, he brought claims for violation of the Illinois Consumer Fraud Act, common law fraudulent misrepresentation, and unjust enrichment. The court dismissed the complaint, finding that his allegations involved nothing more than a potential contract dispute, which is not recoverable as fraud. Emalfarb amended his complaint and now raises violations of the ICFA, common law fraudulent misrepresentation and inducement, unjust enrichment, breach of contract, and negligent supervision.

## II.    Legal Standard

"To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in plaintiff's favor." *Id.* at 600 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The court assesses the complaint's plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

Claims involving alleged fraud are subject to a heightened pleading standard under Rule 9(b). See *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); see also *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 2010 WL 624709, at *6 (N.D. Ill. Feb. 18, 2010) ("ICFA claims sounding fraud or deception are still required to meet the heightened pleading standard of Rule 9(b)."). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity means the "'who, what, when, where, and how' of the  fraud—'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). A defendant's "intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." Fed. R. Civ. P. 9(b); see also *Armstrong v. Daily*, 786 F.3d 529, 547 (7th Cir. 2015).

## III.    Analysis

### A.    Breach of Contract

Under Illinois law, the elements of a breach of contract claim are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the

plaintiff of all required conditions, (5) breach, and (6) damages." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006).[4]

Emalfarb fails to state a claim for breach of contract for multiple reasons. Start with Emalfarb's contention that the Settlement Agreement included the terms of the Bonus Bet Agreement. In general, courts presume a written contract "speak[s] the intention of the parties who signed it, and their intentions must be determined from the language used." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 966 (Ill. App. Ct. 2004); *Langford v. Paravant, Inc.*, 912 So. 2d 359, 360 (Fla. Dist. Ct. App. 2005). Consistent with that presumption, the parole evidence rule bars courts from considering: (1) "evidence [of] understandings not reflected in the contract, reached before or at the time of its execution, which would vary or modify its terms," and (2) "parole evidence of prior negotiations to create an 'extrinsic ambiguity' where the parties to a contract have included an integration clause." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007); *Perrin v. De Soleil S. Beach Ass'n,* Inc., 335 So. 3d 812, 813 (Fla. Dist. Ct. App. 2022).

Here, not only does the Settlement Agreement make no mention of the Bonus Bet Agreement, but it also expressly disclaims the existence of any external agreements with its merger clause: "This Release constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are no other written or oral agreements, understandings or arrangements except as set forth herein." [Dkt. 2 at 3.] So any argument that the Bonus Bet Agreement served as an "addendum" of the Settlement Agreement fails.

In passing, Emalfarb argues that the parole evidence rule does not apply to fraudulent statements. [Dkt. 41 at 16.] This is only half right. When considering a claim for *fraud*, a court may consider an external fraudulent statement despite a contract's integration clause. The same is not true for a breach of contract claim. See *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008) ("So evidence of what was said in the negotiations that led up to the signing of the release would not be admissible—in a suit for breach of contract.") The court addresses the effect of the integration clause on Emalfarb's fraud claims below.

Emalfarb also argues that the Bonus Bet Agreement constitutes a stand-alone agreement [Dkt. 41 at 3 (citing dkt. 35, ¶¶ 51–53).][5] But a valid contract must have

---

[4]     Both parties rely on Illinois contract law. The court observes, however, that the release contains a choice of law provision selecting Florida as the governing law. [Dkt. 2 at 3.] Because there are no dispositive differences between Florida and Illinois law as it pertains to this dispute, the court says no more on the issue.

[5]     Hard Rock avers that Emalfarb's contract claim can be dismissed on statute of frauds grounds. While the statute of frauds would likely come into play eventually, see dkt. 35, ¶ 52 (explaining that the "Bonus Bet Agreement was perpetual"); 740 ILCS 80/1 (providing that contracts "not to be performed within the space of one year" must be "in writing, and signed

both definite terms and a meeting of minds concerning those terms. See *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991) ("A contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.") (cleaned up); *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007) ("No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance."); *Certified Motors, LLC v. Aventine Hill, LLC*, 369 So. 3d 1254, 1257 (Fla. Dist. Ct. App. 2023) ("[W]hen contracting parties do not agree on an essential provision there is no 'meeting of the minds' that is the essence of a contract, and ... it is not the province of the court to make the contract or to supply material terms or provisions omitted by the parties.") Here, based on the allegations in the complaint, the Bonus Bet Agreement meets neither requirement.

That is, the Bonus Bet Agreement, as alleged in the complaint, fails to define the obligations of either party with any certainty. For instance, Emalfarb alleges that Cornacchione promised "an ongoing 20% deposit match, with the only condition being a 3x rollover requirement on all deposits up to $100,000 with the rollover to increase to 5x if [he] was winning." [Dkt. 35, ¶ 52.] But he goes on to say that Cornacchione told him that "future deposit matches [will] be based on play" and that, while Hard Rock was "generally fine with 20%," the company "may have to increase the rollover" so that he did not just withdraw his deposits to receive the 20%. [Dkt. 35, ¶ 58, see *id.* ¶ 56 (alleging that Cornacchione sent Emalfarb a text informing him that the "final offer in writing" would include future deposit matches "based on play"); *id.*, ¶ 72–73 (Cornacchione texted Emalfarb explaining that deposit matches were a "handshake deal" based on "the understanding of our conversations that we've laid out in text messages").] According to the complaint, moreover, Cornacchione represented that the deposit matches would be consistent *only if* Emalfarb did not "abus[e] the offer." [*Id.*, ¶ 58.]

In other words, Emalfarb does not allege that Hard Rock agreed to provide 20% deposit matches no matter what. Instead, these terms—both of which are essential to the alleged contract—were subject to change based on "play" and whether Emalfarb "abused" the offer. Emalfarb does not allege, however, that the parties came to any sort of agreement as to what it would mean to abuse the offer or how "play" could affect the deposit matches. Because the court has "no basis for deciding whether

---

by the party to be charged therewith"), a plaintiff is not required to plead around affirmative defenses, see *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). Still, Emalfarb comes dangerously close to pleading himself out of court. [Dkt. 35, ¶ 60 (alleging that Cornacchione told him the Bonus Bet Agreement "could not be in writing").]

the agreement has been kept or broken, there is no contract." *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991).

### B. Fraud

The court considers Emalfarb's fraud claims together, making distinctions when necessary. Ultimately, Emalfarb falls short of stating claims for violations of the ICFA and common law fraud.

First, as the court discussed in its initial Rule 12(b)(6) order, Emalfarb's fraud claims are "breach-of-contract allegations dressed up in the language of fraud." *Emalfarb*, 2026 WL 215781, at *5 (quoting *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011)).[6] Emalfarb's new allegation that Hard Rock misrepresented Cornacchione's authority does not change the analysis. Whether Cornacchione had apparent authority would simply bear on whether a valid contract exists. See *Am. Kitchen Delights, Inc. v. Signature Foods, LLC*, 2018 WL 1394032, at *5 (N.D. Ill. Mar. 20, 2018) ("Under Illinois law, an agent may bind his principal to a contract where he had actual or apparent authority to do so."). And any damages would stem from the alleged breach of contract, not from Hard Rock's alleged misrepresentation of Cornacchione's authority.

In the end, Cornacchione's allegations about a "handshake deal" fall into "the realm of puffery, bragging, 'mere words,' and casual bonhomie, rather than to that of serious commitment," as a "great many promises" do. *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995). For this type of "promissory fraud," the Seventh Circuit has observed, "a healthy skepticism is a better protection against being fooled by them than the costly remedies of the law." *Id.*[7]

---

[6] Emalfarb relies on *Zeoli v. Signature Fed. Credit Union*, 2026 WL 524120, at *5 (N.D. Ill. Feb. 25, 2026), when arguing that the ICFA applies to consumers who were fraudulently induced into signing a contract. But in that case, the court found fraud based on the defendant unilaterally altering the parties' written contract and forging the plaintiff's signature. In other words, the plaintiff in *Zeoli* did not bring a fraud claim based on the defendant's failure to abide by a promise; he brought a fraud claim based on the defendant's attempt to forge a new contract—a "deceptive act or practice distinct from any underlying breach of contract." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011).

[7] As the Seventh Circuit has explained, Illinois recognizes an exception to the general rule against actions for promissory fraud that allows recovery when the alleged promissory fraud is part of a "scheme" to defraud. See *Desnick*, 44 F.3d at 1354; *Das v. Tata Consultancy Servs. Ltd.*, 118 F.4th 903, 911 (7th Cir. 2024) ("When a complaint alleges a fraudulent misrepresentation regarding future promises, it survives a motion to dismiss only if it also alleges a scheme to defraud."). Emalfarb does not argue that the promissory fraud here falls within that exception. Nor could he: Cornacchione's alleged promise to provide certain deposit matches contingent on Emalfarb's play, if a misrepresentation at all, is not "particularly egregious or, what may amount to the same thing," nor is it embedded in a larger pattern of

Emalfarb also fails to allege a fraudulent or misleading statement. Much like contract claims, "to support an action in fraud, the statement (representation) must be certain and definite." *Commonwealth E. Mortg. Co. v. Williams*, 516 N.E.2d 515, 522 (Ill. App. Ct. 1987). As discussed above, the statements at issue here—promises concerning rollover requirements and deposit matches—do "not actually promise any concrete results." *Aquila Inv. Grp., LLC v. Hiller*, 2019 WL 12496319, at *5 (C.D. Ill. Feb. 11, 2019).

Under the ICFA, moreover, the court considers the allegedly deceptive act "in light of the totality of the information made available to the plaintiff." See *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005). Here, those circumstances include the text of the Settlement Agreement together with Emalfarb's text messages with Cornacchione. To be sure, that the Settlement Agreement contradicts Emalfarb's assertion that Hard Rock agreed to provide a never-ending 20% deposit match does not, on its own, defeat an ICFA claim. See *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001). But the Settlement Agreement's comprehensive integration clause, which expressly denied the existence of any oral agreements, along with its provision disclaiming any promises regarding future deposit matches and offering Emalfarb a limited-time, 20% deposit match for up to $100,000 in new deposits—was all information available to Emalfarb when he signed the Agreement. And so each of these written statements bears consideration when determining whether Cornacchione's pre-contractual statements created a likelihood of deception or had a capacity to deceive a reasonable consumer.[8]

As described above, the text message exchange and other communications between Cornacchione and Emalfarb reveals a "handshake deal" that Hard Rock would provide 20% deposit matches "based on play" and contingent on him not "abusing" the offer. Considering those statements in light of the written Settlement Agreement, a reasonable consumer would not believe that Hard Rock guaranteed 20% deposit matches for an unlimited duration. So even accepting his allegations as true and even drawing all inferences in his favor, Emalfarb has not alleged a misleading statement, particularly through the lens of Rule 9(b)'s heightened pleading standard. See *Killeen v. McDonald's Corp.*, 317 F. Supp. 3d 1012, 1013 (N.D. Ill. 2018) ("Illinois law is clear that where other information is available to dispel that tendency, there is no possibility for deception.").

For these same reasons, Emalfarb does not plead justifiable reliance necessary for his common law fraud claim. See, *e.g.*, *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996) ("If a literate, competent adult is given a document that in readable

---

deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick*, 44 F.3d at 1354.

[8] The Settlement Agreement stated plainly that "[a]ny future bonusing, including deposit matches, would be based on Customer play and is not guaranteed or part of this Release or its Settlement Amount." [Dkt. 2 at 2.]

and comprehensible prose says X (X might be, 'this is a risky investment'), and the person who hands it to him tells him, orally, not-X ('this is a safe investment'), our literate, competent adult cannot maintain an action for fraud against the issuer of the document."); *Hefferman v. Bd. of Trs. of Illinois Cmty. Coll. Dist. 508*, 310 F.3d 522, 527 (7th Cir. 2002) ("Illinois law does not permit a plaintiff to ignore available evidence and then claim that she justifiably relied upon a defendant's verbal misrepresentations."); *Cozzi Iron & Metal, Inc.*, 250 F.3d at 574 (explaining that a court considers "all of the facts that [plaintiff] knew, as well as those facts [plaintiff] could have learned through the exercise or ordinary prudence" when assessing whether reliance on pre-contractual statements was justified). Indeed, Emalfarb himself seemed to understand the importance of having any terms of the settlement agreement in writing—he alleges that he told Hard Rock's VP of Compliance that it would "change[] everything" if he could not get the 20 percent deposit match "in writing." [Dkt. 35, ¶ 54.] See *Vigortone AG Products, Inc. v. PM AG Products*, Inc., 316 F.3d 641 (7th Cir. 2002) (denying recovery because plaintiff had "unaccountably ignored" a "gigantic warning flag.") The ICFA and common law fraud claims are dismissed.

### C.   Negligent Supervision and Unjust Enrichment

In his response brief, Emalfarb leaves Hard Rock's argument for dismissal of his negligent supervision claim "intentionally unopposed." He has not, however, voluntarily dismissed the claim. So, for good measure, the court briefly discusses the sufficiency of his pleading.

"To state a cause of action for negligent supervision, the plaintiff must establish that (1) the employer had a duty to supervise its employee; (2) the employer negligently supervised its employee; and (3) such negligence proximately caused the plaintiff's injuries." *McNerney v. Allamuradov*, 84 N.E.3d 437, 452 (Ill. App. Ct. 2017) (citation omitted). In support of this claim, Emalfarb offers the conclusory allegation that Hard Rock "was negligent in its supervision of Cornacchione." [Dkt. 35, ¶ 151.] He elaborates no further. And, as best the court can tell, no allegations in the complaint support his negligence assertion. While Hard Rock knew that Cornacchione and Emalfarb communicated about the Settlement Agreement, the complaint gives no indication that the company was aware of any discrepancies between Cornacchione's communications and the Settlement Agreement. To the contrary, the complaint avers that Hard Rock met with Cornacchione to discuss those conversations and ensure "everyone [was] on the same page regarding the settlement proposal." [*Id.*, ¶ 55.]

Finally, because Emalfarb's unjust enrichment claim is based on the same improper conduct alleged in his other claims, he has not pleaded a stand-alone claim for unjust enrichment. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("So, if an unjust enrichment claim rests on the same improper conduct alleged in

another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.").

## IV.     Conclusion

Hard Rock's motion to dismiss is granted. Because Emalfarb has already had an opportunity to amend, this dismissal is with prejudice.

Enter: 25-cv-12220
Date: July 29, 2026

_____
Lindsay C. Jenkins
United States District Court Judge

10